# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LASHAWN BOOKER,               )
                             )
    Plaintiff,        )
                             )
v.                           )     No. 3:11-cv-00268
                             )     Chief Judge Haynes
GAYLE RAY, et al.,           )
                             )
    Defendants.       )
                             )

## MEMORANDUM

Plaintiff, Lashawn Booker, filed this action under 42 U.S.C. § 1983 originally against the Defendants: Gayle Ray, Jason Woodall,[1] C. Scott Miller, Joe England, John Fisher, and Chris Barnard, officers and employees of the Tennessee Department of Corrections ("TDOC") who are named in their individual capacities. Plaintiff's claims are that Defendants violated her rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution. Plaintiff's Fourth and Fourteenth Amendment claims arise from the arrest of her allegedly without probable cause by Defendants Miller, England, Fisher and Barnard. Plaintiff's First Amendment claim is that her arrest was in retaliation for her prior complaints to Defendants regarding the harassment and mistreatment of her inmate husband by prison officials.

Before the Court is the motion for summary judgment filed by Defendants Miller, England, Fisher, and Barnard (Docket Entry No. 75), contending, in sum: (1) that Defendant Miller had

---

[1] The Court earlier dismissed Plaintiff's claims against Defendants Ray and Woodall upon finding that the pleadings failed to state legally plausible claims. (Docket Entry No. 55).

probable cause to seek an arrest warrant for Plaintiff; (2) that Defendant Miller's affidavit for a criminal complaint was not false; (3) that these Defendants had authority under state law to secure and execute the arrest warrant for Plaintiff; (4) that Plaintiff fails to state a due process or retaliation claim; and (5) that Defendants are immune from damages under the qualified immunity doctrine.

## I. Findings of Fact[2]

Plaintiff's husband, Donnell Booker, is a TDOC inmate. Each Defendant is an employee in TDOC's internal affairs division. Defendant Miller is a special agent for the law enforcement unit in TDOC's office of investigation and compliance law enforcement. (Docket Entry No. 76-1, Miller's Affidavit, ¶ 2). Defendant Ray, the TDOC Commissioner commissioned Miller as a special agent for the law enforcement unit. Id. at ¶ 4. Miller asserts his commission authorizes his arrests of persons involving the TDOC even if the arrest occurs outside of TDOC property. Id. at ¶ 5. Miller attended the Tennessee Bureau of Investigation and Tennessee Law Enforcement Training Academy for training in basic criminal investigation.[3] Id. at ¶ 3.

Defendants England, Barnard and Fisher are also special agents in the law enforcement unit in TDOC's office of investigation and compliance law enforcement. (Docket Entry Nos. 76-2, 76-3 and 80-1, Defendants' Affidavits). Defendant England is Miller's supervisor and the special agent

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, 106 S.Ct. 2502, 91 L.Ed.2d 202 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 276 (1986). The Court concludes that there are some factual disputes, but the Court concludes that those disputes are not material given the material facts conceded by the Plaintiff. Thus, this section constitutes findings of fact under Fed.R.Civ.P. 56(d).

[3]This training satisfies the Tennessee Peace Officer Standards and Training in Tenn. Code Ann. § 38-8-101 et seq.. (Docket Entry No. 76-1, Miller's Affidavit, ¶ 3).

in charge of TDOC's West Tennessee region. (Docket Entry No. 84-2, Miller's Deposition, at p 15:15-16). The Defendants England, Fisher and Barnard were also trained in basic criminal investigation. Id. Each of the Defendants have executed numerous warrants under their authority as Special Agents for the TDOC in investigations related to the TDOC. Id. Defendants have never been informed that their execution of arrest warrants are outside their authority as Special Agents for the TDOC Law Enforcement Unit. (Docket Entry No. 84, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶ 33). Jason Woodall is the director of the TDOC Office of Investigation and Compliance Law Enforcement.

On January 10, 2008, Plaintiff filed an administrative complaint with the Tennessee Human Rights Commission ("THRC") alleging harassment by prison officials. The THRC notified Plaintiff of its lack of jurisdiction over her complaint. Plaintiff then reported her complaint of harassment to the Ken Locke, a TDOC employee and the TDOC transferred Plaintiff's inmate husband to the West Tennessee State Penitentiary ("WTSP").

On July 22, 2011, Plaintiff's husband filed a Section 1983 action, Booker v. Hankins, Case No. 2:10-cv-02404, Docket Entry No. 28 (W.D. Tenn. 2010), alleging that WTSP employees mistreated him in violation of the Eighth Amendment of the United States Constitution. Id. In that action, Booker alleged that Plaintiff called Harry Stewart, a WTSP employee, to complain about her inmate husband's mistreatment. The director of TDOC's internal affairs division investigated Plaintiff's complaint. Id. On June 4, 2012, Plaintiff's husband moved to voluntarily dismiss his complaint because he "did not desire to pursue any further litigation." Id. at Docket Entry No. 33. Plaintiff's husband's action did not allege any mistreatment by TDOC's internal affairs division.

On July 22, 2010, Woodall assigned Defendant Miller to investigate Plaintiff and her inmate

husband, Donnell Booker. (Docket Entry No. 76-1, Miller's Affidavit, ¶ 6). Miller, the primary

investigator, received some documents and listened to a telephone call between Plaintiff and her

husband. (Docket Entry No. 84-2, Miller's Deposition, p 15:21-25). Inmate Booker is a known

member of the Crips security threat group.[4] As such, the TDOC officials monitored inmate Booker's

calls for information about the Crips gang security threat group in TDOC institutions. (Docket Entry

No. 76-1, Miller's Affidavit, at ¶ 9).

During his investigation, Miller also received a written memorandum dated July 9, 2010, to

Warden Henry Steward of the WTSP from Corrections Officer Patrick Hankins.[5] (Docket Entry No.

76-1, Miller's Affidavit, ¶ 8). The Hankins memorandum reported that on July 7, 2010 at 6:47 p.m.,

inmate Booker called Plaintiff who placed a separate call to Brandon Abernathy, a WTSP inmate.

According to Hankins, Brandon Abernathy is a confirmed member of Rollin' 40's Crips group. Id.

According to the Hankins memorandum inmate Booker, Plaintiff and Abernathy discussed inmate

Kevin "Twin" Seymore. In addition, inmate Booker informed inmate Abernathy, through Lashawn

Booker, that inmate Timothy "lil Tommy" Exum, a suspected Crip member, had assaulted inmate

---

[4]According to TDOC policy, a "security threat group" is a "[g]roup of individuals possessing common characteristics which serve to distinguish them from other groups who have been determined to be acting in concert so as to pose a threat or potential threat to staff, other inmates, the institution, or the community. Hays v. Tennessee, 424 Fed. Appx. 546, 548 (6th Cir. 2011) (citing TDOC Policy 507.02)). The group "Crips" is a "notorious" group, United States v. Tolbert, 8 Fed. Appx. 372, 375 (6th Cir. 2001), with known ties to the incarcerated Crips members and Mexican drug trafficking organizations. "2011 National Gang Threat Assessment - Emerging Trends," FBI, http://www.fbi.gov/stats-services/publications/2011-national-gang-threat-assessment/2011-national-gang-threat-asses sment (last visited Oct. 16, 2012). "Gangs, including the Crips . . . tend to build an internal 'culture,' which influences the decision-making of their members. . . . In view of the characteristics of gang activity repeatedly recognized by the courts, it is reasonable to conclude that, like a drug dealer, a gang member who is known to be currently engaged in criminal activity is involved in a 'continual and ongoing operation.'" United States v. Bethal, 245 Fed. Appx. 460, 475-76 (6th Cir. 2007).

[5]Both Henry Steward and Patrick Hankins were named defendants in inmate Booker's lawsuit in the Western District of Tennessee. Booker v. Hankins, Case No. 2:10-cv-02404, Docket Entry No. 28 (W.D. Tenn. 2010).

Seymore for the disrespect that inmate Seymore's brother had shown inmate Booker. Id. Hankins's memorandum also stated "that inmate Melvin Holt #102257 ('C-Bo') stopped the assault, stating that inmate Booker no longer had any authority at WTSP as he was now at NECX prison." Id. The Hankins memorandum continued "that inmate [Donnell] Booker ordered inmate Abernathy to have Salvador Jones #396235 ('Savage') handle it again [assault inmate Seymore] because he did not hear about it at NECX, so it had not been good enough." Id. During Plaintiff's three-way telephone conversation with inmates Booker and Abernathy, Plaintiff repeated inmate Booker's statements to inmate Abernathy. (Docket Entry No. 84, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶ 18).

Miller then interviewed inmates Seymore, Jones and Exum. (Docket Entry No. 84, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶ 20). Inmates Jones and Exum admitted to Miller that inmate Booker made statements about the inmate Seymore altercations. Id. These inmates reported "that they were instructed by the Security Threat Group 'Crips' to 'get them up' (fight) with inmate Seymore. Further, inmate Seymore confirmed that he had two physical altercations with Inmate Timothy Exum #399566 and inmate Salvador Jones #396235, which were initiated because of alleged disrespect to inmate Booker." (Docket Entry No. 76-1, Miller's Affidavit, ¶ 11). Miller recorded and transcribed these interviews. (Docket Entry No. 84, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶ 23).

On July 7-8, 2010, inmates Abernathy, Jones and Exum each pled guilty to the prison disciplinary charges related to security threat group activity. (Docket Entry No. 76-4, TDOC's Disciplinary Reports). Inmates Abernathy, Jones and Exum admitted to the altercation, but denied any group activity. (Docket Entry Nos. 84-1, Exhibits 1-3). Inmate Jones stated:

On or about July 8, 20120, I was put in 'punitive segregation' under investigation for an alleged fight with an inmate. On July 14, 2010, I was released from punitive segregation. On July 19, 2010, I was placed back in punitive segregation under investigation f[or] being part of a security threat group activity and assault on an inmate. I was subsequently found guilty at a disciplinary hearing for Security Threat Group Activity and was released from Punitive Segregation on July 30, 2010. It is my sworn statement that I did not have involvement in a S.T.G. assault or any other S.T.G. activity. The fight I was involved in was a personal incident between myself and the individual. The incident in question was a one-on-one fight between two men concerning an ongoing misunderstanding and it was settled and over with prior to me being placed in punitive segregation.

(Docket Entry No. 84-1, Jones' Affidavit).

During his investigation, Defendant Miller replayed the Plaintiff-Inmate Booker and Abernathy telephone call recording and added the following to the earlier transcript:

**Inmate Booker:** Man, you need to get on your other phone an ask a nigga, I want to know which one it was.

**Plaintiff:** Hold on (Talking to a 3rd person) Butt, where Butt at? Hello; he said which one because he said they ain't going to try him like that, which one?

**Inmate Booker:** They ain't even in the pod with him.

**Plaintiff:** The one that's across the hall, light skinned that was showing the pictures of his what? Of his WHAT? No man, what did you say?

**Inmate Booker:** The one that's in the cell with Big A.

**Plaintiff:** (Talking to a 3rd person) The one that used to be in the cell with Big A? Yeah that's the one.

**Inmate Booker:** How is that, him and Ronnie Moore ain't even in the pod together.

**Plaintiff:** He said how is that, him and Ronnie Moore ain't in the pod together. Whose phone is this, whose phone was that Robbie Moore was calling us from? Whose phone was Ronnie Moore calling us from, Nut, because he acts like I'm just calling dude, whose phone was that dude calling from?

**Inmate Booker:** Shut the fuck up.

**Plaintiff:** What phone?

**Inmate Booker:** I don't give a fuck about that shit, I don't care.

**Plaintiff:** (Talking to a 3rd person) What she say; whose 901 number was that that me and you was calling and Ronnie Moore was calling us on, whose 901 number is that? That's Twin's number, that the number, that's the one he called us on (untranslatable) they did, they said they did take care of it.

**Inmate Booker:** They didn't take care of it man

**Plaintiff:** They said he ain't heard nothing about it. They said so what man.

**Inmate Booker:** Man, they need to take care of that, fuck you mean?

**Plaintiff:** He said ya'll need to take care of that, "f" you me. Lil Timmy did off the flop.

**Inmate Booker:** He ain't do it good evidentially, he didn't.

**Plaintiff:** (Talking to a 3rd person) he said he didn't do it good evidentially; C-Bo tried to save him.

**Inmate Booker:** Na fuck C-Bo.

**Plaintiff:** He said "f" C-Bo.

**Inmate Booker:** Nah, they need to get ???? again.

**Plaintiff:** He said nah, they got go again.

**Inmate Booker:** Tell Savage to take care of that.

**Plaintiff:** (Talking to a 3rd person) Where's Chucky at? Get in touch with Chucky and tell Chucky get him.

**Inmate Booker:** Nah tell Savage[6] to take care of that.

**Plaintiff:** Savage tried to fight?????

**Inmate Booker:** Tell Savage to take care of that.

---

[6]"Savage" is the nickname for inmate Salvador Jones. (Docket Entry No. 76-1, Miller's Affidavit ¶ 8).

**Plaintiff:** What Savage? Yeah go get Savage and then get Chucky on the phone; all right. Do you want me to read off to you what was said?

**Inmate Booker:** Yeah.

(Docket Entry No. 76-1, Phone Call Transcript with Miller's Additions).

On July 14, 2010, Miller presented Richard Jennings, the Lauderdale County, Tennessee court clerk, with the affidavit in support of a criminal complaint seeking an arrest warrant for Plaintiff. (Docket Entry No. 86, Defendant's Response to Plaintiff's Statement of Additional Material Facts, ¶ 3-5). Miller cited as proof of probable cause for Plaintiff's arrest: "Officer Hankins's written memorandum, the taped telephone conversations between inmate Booker, Lashawn Booker and Brandon Abernathy, and [his] interviews with inmates Seymore, Exum and Jones." (Docket Entry No. 76-1, Miller's Affidavit, ¶ 12). Miller's affidavit states as follows:

> On July 7, 2010, LaShawn Harbison Booker placed a call to inmate Brandon Abernathy at the West [Tennessee] State Prison in Henning, [Tennessee] (Lauderdale [County]) and told inmate Abernathy to assault inmate Kevin Seymore (telephone call recorded).
>
> On July 7, 2010, inmate Salvador Jones went to inmate Kevin Seymore and assaulted him. Note: All inmates listed above are affiliated with security threat group "crips." Therefore[,] Lashawn Harbison Booker did solicit the assault of inmate Kevin Seymore at the West [Tennessee] State Prison in Henning, Tennessee.

(Docket Entry No. 76-1, Miller Affidavit). Based on this affidavit, Jennings found probable cause and issued a warrant for Plaintiff's arrest. (Docket Entry No. 76-1, Arrest Warrant). On July 15, 2010, Defendants Miller, England, Fisher and Barnard arrested Plaintiff. (Docket Entry No. 76, Miller's Affidavit, ¶ 15).

These Defendants were unaware of Plaintiff's prior administrative complaints to TDOC or her husband's legal action. Id. at ¶ 16. Yet, in her deposition, Plaintiff states that she called Miller

about her prior complaints and grievances. (Docket Entry No. 84-3, Booker's Deposition). The

Defendants insist that they did not recall these prior complaints or that they had any prior knowledge

of Plaintiff's complaints. (Docket Entry Nos. 76-1, 76-2, 76-3 and 80-1, Defendants' Affidavits).

Yet, in 2009, England investigated a complaint that inmate Booker had been subject to excessive

force by prison employees. (Docket Entry No. 76-2, England's Affidavit, ¶ 6).

After her arrest, Plaintiff spent one night in jail and was released the following afternoon.

(Docket Entry No. 86, Defendant's Response to Plaintiff's Statement of Additional Material Facts,

¶ 23). The District Attorney General's Office of Lauderdale, County later dropped the charges

against Plaintiff. (Docket Entry No. 76-5, Livingston's Affidavit, ¶ 5).

## II. Conclusions of Law

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. "The

very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof

in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee

notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary

judgment sua sponte, so long as the opposing party was on notice that she had to come forward with

all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v.

Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court

explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment
> `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,
> and admissions on file, together with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving party is entitled to a
> judgment as a matter of law.' By its very terms, this standard provides that the mere

existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact.

> **As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.** Factual disputes that are irrelevant or unnecessary will not be counted.

Id. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989); see also Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Celotex Court:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c)

standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex, 477 U.S. at 322 and Rule 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion. . . . [and] must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby, 477 U.S. at 251, 255). Moreover, the Sixth Circuit explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790 (6th Cir. 1990) (quoting Liberty Lobby, 477 U.S. at 151-52) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.").

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

More important for present purposes, **summary judgment will not lie if the dispute about a material fact is `genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party**.

\* \* \*

Progressing to the specific issue in this case, we are convinced that **the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits**. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, **the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented**. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. **The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'**

Liberty Lobby, 477 U.S. at 248, 252 (citations omitted).

It is likewise true that

[I]n ruling on motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the

nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (citation omitted). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) (requiring each party to provide a statement of undisputed facts to which the opposing party must respond).

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.  Complex cases are not necessarily inappropriate for summary judgment.

2.  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.  The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.  A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a

13

directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Id. at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law?

At the outset, Plaintiff's Fourteenth Amendment claims are that Defendants violated her Fourteenth Amendment right to due process of law in arresting her. Yet, the Fourth Amendment governs all claims arising out of an arrest, as the Supreme Court explained: "[w]here a particular [constitutional] amendment provides an explicit textual course of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing th[o]se claims." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 842 (1998). Accordingly, Plaintiff's Fourteenth Amendment claims should be dismissed.

Forty-two United States Code Section 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. West v. Atkins, 487 U.S. 42, 48 (1988). The two essential elements of a claim a Section 1983 claim are: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether the conduct deprives a person of rights, privilege, or immunities secured by the Constitution or laws of the United States. Street v. Corr. Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996). Here, Defendants, TDOC officers and employees, qualify as state actors.

Of the Defendants' contentions, the Court first addresses the Defendants' assertion of absolute and qualified immunity as defenses to Plaintiff's damages claims. In sum, Defendants contend that, in arresting Plaintiff, they performed a quasi-judicial function, entitling them to absolute immunity. (Docket Entry No. 76 at 11). Alternatively, Defendant asserts qualified immunity for lack of a clearly established right that they violated in arresting Plaintiff. Id. at 9, 15. Plaintiff contends that the absolute immunity does not apply to "the manner of execution of the warrant" and that the qualified immunity doctrine fails as Plaintiff's right were clearly established at the time of

her arrest. (Docket Entry No. 83 at 10-12).

For the absolute immunity analysis, the Court considers "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229 (1988). The Supreme Court explained that § 1983 provides absolute immunity to the function "intimately associated with the **judicial** phase of the criminal process." Imbler v. Pacthman, 424 U.S. 409, 430 (1976) (emphasis added). In Malley v. Briggs, 475 U.S. 335 (1986), the Supreme Court held that law enforcement officials are not absolutely immune from a false arrest claim when the officers were executing an arrest warrant. The Supreme Court explained the difference between a prosecutor's absolute immunity and a police officer:

> We intend no disrespect to the officer applying for a warrant by observing that his action, while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment. . . . Exposing the prosecutor to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability. Thus, we shield the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process.

> The organized bar's development and enforcement of professional standards for prosecutors also lessen the danger that absolute immunity will become a shield for prosecutorial misconduct. . . . The absence of a comparably well-developed and pervasive mechanism for controlling police misconduct weighs against allowing absolute immunity for the officer.

Id. at 342-43 and n. 5. Thus, law enforcement officials are not entitled to absolute immunity for executing arrest warrant, unless the arrest warrant is for an individual to appear and testify at a judicial proceeding. DeBoer v. Martin, 537 F. Supp. 1159, 1163 (N.D. Ill. 1982)). Accordingly, the Court concludes that Defendants do not enjoy absolute immunity for Plaintiff's damages claims of unlawful arrest.

16

As to Defendants' qualified immunity defense, qualified immunity grants immunity from damages for individuals performing discretionary function when the right violated was not clearly established at the time of the violation. In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court held that for qualified immunity, the Court must assess whether government officials acting in their official capacity "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818. "Whether an official protected by qualified immunity may be held personally liable for an allegedly official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time the action was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987); see also Cullinan v. Abramson, 128 F.3d 301, 309 (6th Cir. 1997) ("The statutory or constitutional rights in question must have been 'so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'").

In Wilson v. Layne, 526 U.S. 603, 609 (1999), the Supreme Court expressly stated that courts "must first determine whether the plaintiff has alleged the deprivation of a constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." In 2001, the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001) stated: "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly

established." 533 U.S. at 201 (citing Siegert, 500 U.S. at 232).

After criticisms of some circuits and others, the Supreme Court has since held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). In doing so, the Court recognized that in some instances, unnecessary costs can be imposed under the Saucier test.

In Pearson, the Supreme Court identified those costs concerns that may warrant the declination of the two-step analysis:

> As a result, **several courts have identified an "exception" to the Saucier rule for cases in which resolution of the constitutional question requires clarification of an ambiguous state statute.** Egolf v. Witmer, 526 F.3d 104, 109–111 (3rd Cir. 2008); accord, Tremblay v. McClellan, 350 F.3d 195, 200 (1st Cir. 2003); Ehrlich v. Glastonbury, 348 F.3d 48, 57–60 (2d Cir. 2003). Justifying the decision to grant qualified immunity to the defendant without first resolving, under Saucier's first prong, whether the defendant's conduct violated the Constitution, **these courts have observed that Saucier's "underlying principle" of encouraging federal courts to decide unclear legal questions in order to clarify the law for the future "is not meaningfully advanced ... the precise factual basis for the plaintiff's claim or claims may be hard to identify. . . .**
>
> **[B]riefing of constitutional questions is woefully inadequate.** See Lyons, supra, at 582 (Sutton, J., concurring)
>
>                \*     \*     \*
>
> **Where a court holds that a defendant committed a constitutional violation but that the violation was not clearly established, the defendant may face a difficult situation. As the winning party, the defendant's right to appeal the adverse holding on the constitutional question may be contested.**
>
>                \*     \*     \*
>
> **Adherence to Saucier's two-step protocol departs from the general rule of constitutional avoidance and runs counter to the "older, wiser judicial counsel 'not to pass on questions of constitutionality ... unless such adjudication is unavoidable.'"** Scott, 550 U.S., at 388.

Id., at 238, 239, 240, 241.

Later, in <u>Camreta v. Greene</u>, 131 S.Ct. 2020 (2011), the Supreme Court eliminated one cost concern in adopting a policy to consider an appeal to that court by a winning party on a qualified immunity ruling. The Supreme Court's rationale included that:

> We think just such a reason places qualified immunity cases in a special category when it comes to this Court's review of appeals brought by winners. The constitutional determinations that prevailing parties ask us to consider in these cases are not mere dicta or "statements in opinions." <u>Rooney</u>, 483 U.S., at 311, 107 S.Ct. 2852 (internal quotation marks omitted); <u>see</u> <u>Bunting</u>, 541 U.S., at 1023, 124 S.Ct. 1750 (SCALIA, J., dissenting from denial of certiorari) (stating that such a determination is " not mere dictum in the ordinary sense"). **They are rulings that have a significant future effect on the conduct of public officials—both the prevailing parties and their co-workers—and the policies of the government units to which they belong. <u>See</u> <u>supra</u>, at 2028 – 2030. And more: they are rulings self-consciously designed to produce this effect, by establishing controlling law and preventing invocations of immunity in later cases. And still more: they are rulings designed this way with this Court's permission, to promote clarity—and observance—of constitutional rules. We describe in more detail below these features of the qualified immunity world and why they came to be. We hold that taken together, they support bending our usual rule to permit consideration of immunized officials' petitions.**
> \* \* \*
> But we have long recognized that this day may never come – **that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo…** Indeed, for some time we *required* courts considering qualified immunity claims to first address the constitutional question, so as to promote "the law's elaboration from case to case." <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). More recently, we have left this matter to the discretion of lower courts, and indeed detailed a range of circumstances in which courts should address only the immunity question. <u>See</u> <u>Pearson</u>, 555 U.S., at 236–242, 129 S.Ct. 808. In general, courts should think hard, and then think hard again, before turning small cases into large ones. But it remains true that following the two-step sequence— defining constitutional rights and only then conferring immunity-is sometimes beneficial to clarify the legal standards governing public officials.

Id. at 2030, 2031-32 (emphasis added).

Moreover, despite its recognition of cost concerns, the Supreme Court in <u>Pearson</u> reiterated

the value of <u>Saucier</u>'s two-step process.

> Although we now hold that the <u>Saucier</u> protocol should not be regarded as mandatory in all cases, **we continue to recognize that it is often beneficial. For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the "clearly established" prong. "[I]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be."** <u>Lyons v. Xenia</u>, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring). In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all. In addition, **the <u>Saucier</u> Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.**

555 U.S. at 236.[7]

Moreover, as the Supreme Court has repeatedly observed: "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all," <u>Siegert</u>, 500 U.S. at 232, and that "'it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be.'" <u>Pearson</u>, 555 U.S. at 236 (quoting <u>Lyons v. Xenia</u>, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

The Court fails to discern here any costs considerations that counsel against the application of <u>Saucier</u>'s two step analysis. Under these circumstances, the Court concludes that conducting the

---

[7] "The empirical data proves that mandatory <u>Wilson-Saucier</u> sequencing is necessary to ensure robust articulation of constitutional rights." Paul W. Hughes, "Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights," 80 U Colo. L. Rev. 401, 420 (2009). A corollary to that finding is that failure to articulate whether a constitutional right exists tends to expand the exercise of governmental authority over a person.

Saucier two step analysis is appropriate.

As to whether the Defendants are immune from damages on Plaintiff's Fourth Amendment claims arising from their arrest of her, the threshold inquiry is a legal question for the Court. Hunter v. Bryant, 502 U.S. 224 (1991). In Hunter, the Supreme Court awarded qualified immunity to officers who made an arrest based upon a rambling letter about a plot to kill the president. The criminal charges were later dismissed. The district court denied immunity to the arresting agents and the Court of Appeals held that the agents' reading of the letter "was not the most reasonable." Id. at 227. The Supreme Court reversed.

> Our cases establish that qualified immunity shields agents Hunter and Jordan from suit for damages if "a reasonable officer could have believed [Bryant's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." Even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity. Moreover, because "[t]he entitlement is an immunity from suit rather than a mere defense to liability," we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

> The decision of the Ninth Circuit ignores the import of these decisions. The Court of Appeals' confusion is evident from its statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment . . . based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." **This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.**

Id. at 536-37(citations omitted). Accord Greene v. Reeves, 80 F.3d 1101, 1104 (6th Cir. 1996).

On a Fourth Amendment claim in a § 1983 action, the Court engages in an initial review of the search or seizure for its objective reasonableness. In Anderson, the Supreme Court considered

a Fourth Amendment claim in a Bivens action where an FBI agent engaged in a warrantless search of a plaintiff's home, looking for a bank robbery suspect. The Supreme Court stated that as a preliminary matter, the Court must decide if the alleged Fourth Amendment seizure was "obviously unreasonable."

> Noting that no discovery has yet taken place, the Creightons renew their argument that, whatever the appropriate qualified immunity standard, some discovery would be required before Anderson's summary judgment motion could be granted. We think the matter somewhat more complicated. One of the purposes of the Harlow qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government." 457 U.S., at 817 (footnote omitted). For this reason, we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation. Id. at 818. See also Mitchell, supra, 472 U.S. at 526. **Thus, on remand, it should first be determined whether the actions the Creightons allege Anderson to have taken are actions that a reasonable officer could have believed lawful. If they are, then Anderson is entitled to dismissal prior to discovery. If they are not, and if the actions Anderson claims he took are different from those the Creightons allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before Anderson's motion for summary judgment on qualified immunity grounds can be resolved.** Of course, any such discovery should be tailored specifically to the question of Anderson's qualified immunity.

483 U.S. at 646 n.6 (citations omitted).

Yet, precedent is not required for all Fourth Amendment claims in order to conclude that the right is clearly established. In a word, immunity from damages does not attach simply "because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances." Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985).

The core of Plaintiff's Fourth Amendment claim is whether the Defendants possessed the legal authority to arrest Plaintiff. Defendants contend that Tenn. Code Ann. §§ 4-3-609 and 40-7-118 authorize their arrest of Plaintiff outside of TDOC premises. (Docket Entry No. 76 at 12).

22

Defendants argue that "Tenn. Code. Ann. § 4-3-609(b), . . ., applies specifically to department of correction internal affairs special agents. The special agents' powers in subsection (b) do not contain the limitations set forth in subsection (a)(1)-(4)." (Docket Entry No. 85 at 6). In response, Plaintiff asserts that Tenn. Code Ann. § 4-3-609 "makes it clear that the Defendants did not have" the authority to arrest Plaintiff and further that there were no exigent circumstances. (Docket Entry No. 83 at 7, 9). Plaintiff also contends that Defendants lack the legal authority under the private citizen arrest statute, Tenn. Code Ann. § 40-7-109, because Plaintiff's alleged misdemeanors were not committed in the Defendants' presence. (Docket Entry No. 83 at 9).

The authority of a state arrest is determined by the law of the applicable state. United States v. Dire, 332 U.S. 581, 588-89 (1948); United States v. Layne, 6 F.3d 396, 398 (6th Cir. 1993). The Defendants' authority to arrest is based upon state statutes governing the TDOC, the Defendants' employer. Under Tennessee law, "[e]very action taken by an agency must be grounded in an express grant of authority or must arise by necessary implication from an express statutory grant of authority." Sanifill of Tenn., Inc. v. Tenn. Solid Waste Disposal Control Bd., 907 S.W.2d 807, 810 (Tenn. 1995).

Here, the pertinent Tennessee statutes are the statutes authorizing TDOC special agents and the authority of a peace officer. In 2012, the Tennessee General Assembly enacted amendments to TDOC statute governing its employees' law enforcement authority and use of firearms:

> (a) Those employees of the Department of Correction as the commissioner shall designate who have been trained in the use of firearms are vested with the powers and authority of law enforcement officers, including the authority to carry weapons, and may exercise such powers and authority while performing special details and assignments in the course of their duties as authorized by the commissioner. These instances may include the search for and apprehension of escapees, transporting inmates, assisting other law enforcement agencies, and other functions while on duty

23

and under the supervision of the department.

(b)(1) **Those employees of the Department of Correction appointed as special agents or as director of internal affairs and who have successfully completed law enforcement training in accordance with internal standards, including firearms training and successful completion of the Tennessee Bureau of Investigations basic agent training, shall be fully vested and sworn by the commissioner as full-time law enforcement officers.** The department's internal standards shall include, at a minimum, forty (40) hours initial training and eight (8) hours annual in-service training in firearms qualification administered by an instructor with certification from the Tennessee Correction Academy's firearms instructor program or from a police firearms instructor training program conducted or sanctioned by the Federal Bureau of investigation or the National Rifle Association. These agents and director shall have full authority to investigate and enforce the laws of the State of Tennessee and their mission shall focus on matters relative to the Department of Correction as well as those matters assisting other local, state, and federal agencies. These agents and director shall be so commissioned to carry weapons in the course of their duties and as is consistent with applicable standards for law enforcement personnel.

(2) Persons employed by the Department of Correction as internal affairs special agents or as an internal affairs director shall have the full power to administer oaths and take oral and written statements.

(c) The commissioner shall also establish internal procedures concerning appropriate exercise of the powers and authority vested by this section.

Tenn. Code Ann. § 4-3- 609 (2012) (emphasis).

Prior to the 2012 amendments, for TDOC internal affairs division employees, who are commissioned as peace officer under state law, Tenn. Code Ann. § 4-3-609 provided, in part:

(a) **Those employees of the department of correction as the commissioner shall designate who had been trained in the use of firearms are vested with the powers and authority of peace officers, including the power to carry weapons, and shall exercise such powers and authority only:**

(1) While on the grounds of the institutions under the supervision of the department;

(2) While transporting inmate between institutions;

(3) While pursuing escapees from such institutions; or

(4) While aiding local law enforcement officials in the search and apprehension of escapees.

(b)

(1) Subject to the written directive of the commissioner, persons employed by the department of correction as an internal affairs special agent or as an internal affairs director who have successfully completed firearms qualification training shall have the authority to carry weapons for the purposes of their offices and while in performance of their assigned duties, including, but not limited to, conducting authorized investigations and assisting federal, state and local law enforcement in matters relating to the duties and responsibilities of the department. . . .

(2) Persons employed by the department of correction as internal affiars special agents or as an internal affairs director shall have the full power to administer oaths and take oral and written statements.

Tenn. Code Ann. § 4-3-609 (2010).

Defendants also cited that the TDOC policy allows special agents, commissioned as peace officers, have the authority to arrest, even outside of TDOC property. TDOC Policy 107.01, "[i]n accordance with TCA 4-3-609, the Commissioner shall select and commission each IA [Internal Affairs] special agent as a peace officer. This commission shall be in writing and signed by the Commissioner. The IA agents will exercise these powers at any location in the State of Tennessee when conducting the business of the Department."

As to the definition of "peace officer," Tenn. Code Ann. § 40-7-118 defines "peace officer" as an officer, employee or agent of government who has a duty imposed by law to:

(I) Maintain public order;

25

(ii) Make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses; and

(iii) Investigate the commission or suspected commission of offenses;

Tenn. Code Ann. § 40-7-118.

Here, the Defendants who are appropriately trained employees of TDOC's internal affairs are now "fully vested and sworn by the commissioner as full-time law enforcement officers." Tenn. Code Ann. § 4-3-609(b). Under the 2010 version of § 4-3-609(b), the Defendants, as TDOC special agents, possessed the legal authority as peace officers. Id. In 2010, as peace officers, Tennessee law granted the Defendants the legal authority to arrest outside of their geographical jurisdiction. Payne, 6 F.3d at 398 (citing State v. Johnson, 661 S.W.2d 854 (Tenn. 1983)). Thus, the only remaining issue is probable cause.

The Fourth Amendment also requires that a law enforcement official have probable cause to make an arrest. U.S. Const. Am. IV. The Supreme Court has explained the essence of probable cause:

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be searched or seized. In Illinois v. Gates, we noted:

> 'As early as Locke v. United States, 7 Cranch 339, 348 (1813), Chief Justice Marshall observed, in a closely related context: '[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . It imports a seizure made under circumstances which warrant suspicion.' More recently, we said that 'the quanta . . . of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant.

26

Finely turned standard such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trial, have no place in the [probable-cause] decision.

To determine whether an officer had probable cause to arrest an individual, we examine the event leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.

Maryland v. Pringle, 540 U.S. 366, 372 (2003) (internal citations omitted).

To prevail on a claim of unlawful arrest, Plaintiff must prove the absence of probable cause. Brooks v. Rothe, 577 F.3d 701, 706 (6th Cir. 2009). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Id. (quoting Logsdon v. Hains, 492 F.3d 334, 341 (6th Cir. 2007) (quoting Henry v. United States, 361 U.S. 98, 102 (1959))). "The question [the Court] must answer is ' whether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] has committed or was committing an offense.'" Smith v. Thornburg, 136 F.3d 1070, 1076 (6th Cir. 1998) (quoting Donovan v. Thames, 105 F.3d 291, 298 (6th Cir. 1997)).

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. McClain, 444 F.3d 556, 562 (6th Cir. 2005) (quoting United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993)). Defendants cited Vakilian v. Shaw, 335 F.3d 509, 517 (6th Cir. 2003); "in a civil rights case, investigators are entitled to rely on a judicially-secured arrest warrant as satisfactory evidence of probable cause." (Docket

Entry No. 85 at 1). Here, the state official found probable cause to issue the arrest warrant for Plaintiff. That determination is entitled as a matter of law to "great deference." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

Here, Defendants arrested Plaintiff for solicitation of an assault, Tenn. Code Ann. § 39-13-101 defines assault as follows:

> (a) A person commits assault who:
>
>> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
>> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
>> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocation.

As to solicitation, Tenn. Code Ann. § 39-12-102 provides:

> (a) Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

Tenn. Code Ann. § 39-12-102.

In their motion for summary judgment, Defendants contend that probable cause existed under Tennessee law based upon Miller's affidavit. (Docket Entry No. 76 at 6). Plaintiff challenges probable cause because under Tennessee law, solicitation requires the specific intent that the crime of assault be committed and Plaintiff asserts that under Tennessee criminal law, assault requires

28

Plaintiff to inflict bodily injury or cause fear of imminent bodily injury for which Defendant lacked evidence that Plaintiff assaulted anyone. Id.

Here, at the time of Plaintiff's arrest, the Defendants had evidence that Plaintiff participated in a telephone call with individual gang members. During this telephone conversation, Plaintiff repeated an assault order from another inmate. Miller's interviews of inmates corroborated this assault. Thus, the Court concludes that these facts would establish probable cause to arrest Plaintiff in 2010 on charges of assault and solicitation under Tennessee law.

For her retaliatory arrest claim, Plaintiff must prove the absence of probable cause. Trice v. McEachen, 772 F. Supp. 2d 903, 911 (M.D. Tenn. 2011) (quoting Barnes v. Wright, 449 F.3d 709, 720 (6th Cir. 2006)). "When a § 1983 claim is predicated on a claim of false arrest, false imprisonment, or malicious prosecution under the Fourth Amendment, such claim must fail if probable cause for arrest exists. That is, '[t]he existence of probable cause for an arrest totally precludes a [§] 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution, regardless of whether the defendants had malicious motives for arresting the plaintiff.'" Lausin v. Bishko, 727 F. Supp. 2d 610, 633 (N.D. Ohio 2010). The Sixth Circuit explained that defendants "sued under § 1983 for First Amendment retaliation were entitled to qualified immunity on the grounds that the plaintiff could not establish the absence of probable cause in his underlying prosecution." Barnes, 449 F.3d at 720.

As to whether Miller's affidavit contained false statements for Plaintiff's retaliatory arrest claim, Defendants contend that "Ms. Booker has admitted that she telephoned inmate Abernathy at West Tennessee State Penitentiary. The telephone call is recorded. The tape speaks for itself." Id. at 8. Defendants contend that Plaintiff's proof fails to show that "Miller **knowingly** made false

statements and omissions to the judge." (Docket Entry No. 85 at 1). In response, Plaintiff asserts that

"the falsity of Miller's affidavit is reflected by the lack of evidence that Booker's call was placed to

Abernathy:

- that Brandon Abernathy did not discuss the alleged altercation prior to the issuance of the warrant.

- Miller questions whether Abernathy was in fact a "go-between."

- Miller admitted that Abernathy was not in fact told to assault Kevin Seymore.

- During the telephone conversation between Plaintiff and her husband, did Plaintiff tell Salvador Jones to assault Seymore or ask anyone to tell Jones to assault Seymore.

- In the telephone conversation between LaShawn Booker and Donnell Booker when LaShawn Booker tells Donnell Booker that someone tried to "get them up" with "Twin." Donnell Booker asked LaShawn Booker "for what?"

- In his interview, Salvadore Jones denied any knowledge of Donnell Booker (C-Nell)'s wife communicating any order.

- In his interview, Kevin Seymore testified as follows concerning the reason for his fights with Salvadore Jones: This come from a misunderstanding me and him had, he was saying that I was scared to get them up with him.

- In his interview, Kevin Seymore testified that he believed Salvadore Jones came to his call to "get them up" "on his own because he just wanted to prove a point, just a point off."

- Kevin Seymore testified in his interview that both fights were "for show" and nobody intended to hurt anyone else and it was known ahead of time.

(Docket Entry No. 83 at 5).

Plaintiff does not present proof that Defendant Miller made false statements or omissions in his affidavit in support of his application for a criminal complaint. Accordingly, the Court concludes that Plaintiff's arrest was reasonable under the Fourth Amendment and summary judgment should be granted to the Defendants.

As to Plaintiff's First Amendment retaliation claim Plaintiff must prove that:

(1) she engaged in protected conduct;

(2) an adverse action was taken against the plaintiff that would deter a person of ordinaryfirmness from continuing to engage in that conduct; and

(3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

\* \* \*

Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

Thaddeus-X v. Blatter, 175 F.3d 378, 394, 399 (6th Cir. 1999); see also Gaspers v. Ohio Dept. of Youth Servcs., 627 F. Supp.2d 832, 849 (S.D. Ohio 2009). As threshold issue,"[a]bsent protected conduct, plaintiffs cannot establish a constitutional violation." Id. at 395.

Here, the Court concludes that Plaintiff engaged in protected conduct when she filed complaints with TDOC officers about harassment and mistreatment of her inmate husband.

For the second element, "an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." Id. (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982) (Poser, J.)). Plaintiff asserts her arrest is the adverse action. Here, the Court concludes

31

that an arrest is an adverse action.

As to the third element of a causal connection between the protected conduct and the adverse action, "[t]he subjective motivation of the defendants is at issue." Thaddeus-X, 175 F.3d at 399. Subjective motivation "involv[es] proof of a defendant's intent [that] seldom lend[s] . . . to summary disposition' and 'circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment.'" Kennedy v. City of Villa Hills, 635 F.3d 210, 218 (6th Cir. 2011) (quoting Holzemer v. City of Memphis, 621 F.3d 512, 525-26 (6th Cir. 2010)).

The theory of Plaintiff's claim is that the Defendants' arrest of Plaintiff was "undertaken in retaliation for Mrs. Booker's filing complaints concerning the treatment of herself and Donnell Booker . . . in an attempt to dissuade [Plaintiff] from any further complaints against the TDOC" and "in an attempt to punish [Plaintiff] for seeking redress of her legitimate grievances" in violation of the First Amendment. (Docket Entry No. 43, Amended Complaint ¶ 43-45). Defendants contend that Plaintiff's First Amendment claim fails for Plaintiff's lack of proof that the Defendants had knowledge or recollection of any of Plaintiff's prior complaints or legal actions and Defendants also argue that they had probable cause to arrest Plaintiff. (Docket Entry No. 76 at 18). Defendants' affidavits state that they either did not recall Plaintiff's prior complaints nor know about her complaints.

Here, however, given the Court's conclusion of probable cause to arrest Plaintiff, and the lack of evidence that Defendants were unaware of Plaintiff's prior complaints or her husband's complaint, the Court concludes that Plaintiff cannot prove the absence of probable cause and her First Amendment retaliatory arrest claim fails.

## C. Conclusion

For these reasons, the Court concludes that Defendants' motion for summary judgment should be granted.

An appropriate Order is filed herewith.

**ENTERED** this _____ day of November, 2012.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court